15 N.J. Super. 107 (1951)
83 A.2d 33
ANNE FRANK, PLAINTIFF,
v.
FRANK'S, INC., A CORPORATION, MICHAEL FRANK AND JOSEPH FRANK, JR., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 9, 1951.
*109 Mr. Samuel Roessler, attorney for the plaintiff.
Mr. Herman L. Braun, attorney for the defendants.
FRANCIS, J.C.C. (temporarily assigned).
Plaintiff, claiming to be the widow of Joseph Frank, Sr., deceased, seeks a judgment declaring the existence of her dower right in premises at 1371 Springfield Avenue, Irvington, N.J. In order to succeed, she must show, by the greater weight of the evidence, two basic facts; first, that she is the lawful widow of the decedent, and second, that the decedent, as her husband, or another to his use, was seized of an estate of inheritance at some time during coverture. (R.S. 3:37-1.)
There is no dispute that plaintiff and decedent were married by a ceremonial marriage on September 14, 1938. Nor *110 is it disputed that thereafter they lived together as husband and wife until some time in September, 1947, at which time a separation took place. Then they lived apart until Frank's death, November, 1950.
On cross-examination, the plaintiff admitted that in 1926 she had entered into a common law marriage with one Albert Minichella. A daughter was born of this marriage and she is now 23 years of age. Very few details of the marriage were disclosed beyond Mrs. Frank's admission. No testimony was offered as to the state in which the marriage contract was entered into, nor as to whether, if it was not New Jersey, such state recognized common law marriages. The terms of the agreement were not inquired into, so the record does not show whether the parties agreed to become man and wife, to live together as such, and to hold each other out to the world as husband and wife. However, it does appear that they lived together in Newark, N.J., that Minichello's mother lived with them, and that Mrs. Frank was friendly with and visited his relatives. Their place of residence was in Newark until December, 1928, when a separation took place because Minichello was running around with other women.
While the evidence is rather obscure, the parties, and particularly the plaintiff, seem to take it for granted that a valid common law marriage existed. Consequently, the court has accepted their conclusion and will deal with the action on the theory presented at the trial, namely, that the second ceremonial marriage of plaintiff must be considered valid because a presumption of Minichella's death existed at the time it was contracted.
According to Mrs. Frank, she never saw Minichella nor heard from him after their separation in December, 1928. She inquired of his parents and sister about him and his whereabouts, and they in turn made the same inquiry of her. But no word from him or about him ever came to her. Her daughter testified that she does not remember her father and has never seen him within her recollection. Mrs. Frank remained friendly with Minichella's sister until some time *111 after her marriage with decedent, and ceased seeing her only upon his request.
Frank was informed of plaintiff's earlier marital status before their marriage. Thereafter, her daughter lived with them and he permitted her to change her name to his by the usual court procedure.
Thus it appears that Minichella has not been seen or heard from for about 23 years now and had not been heard from or seen for about 10 years prior to this ceremonial marriage. These facts create a statutory presumption that he is dead and that he was dead on September 14, 1938, at the time of the ceremonial marriage. (R.S. 3:42-1.) With respect to the validity of a second marriage under such circumstances, Herr on Marriage, Divorce and Separation has this to say:
"The presumption of the continuance of life fades gradually with the expiration of time until, at the end of seven years of absence of a party, the presumption of death arises. If a second marriage is contracted after a spouse has been absent for seven years, the marriage is considered as valid if there is no rebutting proof of the continued life of the absentee." (§ 46, p. 58.)
In Burkhardt v. Burkhardt, 63 N.J. Eq. 479 (Ch. 1902), a decree of nullity was sought on an allegation that the wife was married and undivorced at the time of her union with complainant. The evidence disclosed that the wife had married one Hoffman and lived with him for about a year. He disappeared in 1890 and the marriage in question took place in 1898. The decree was denied. Vice-Chancellor Pitney, among other things, said:
"The law applicable to the facts is perfectly well settled. Independent of our statute, there is a presumption against the continuance of life after a long absence, without evidence of continuing life. At the common law the turning point was fixed at seven years. * * * The common law presumption is made imperative by our statute."
Not only is there a presumption of death in our case but there is also a potent presumption in favor of the validity *112 of the second marriage. This presumption is of such strength that a judgment of nullity of a second marriage will not be granted unless the former marriage and its existence at the time of the second marriage are proved by very conclusive evidence. Keller v. Linsenmyer, 101 N.J. Eq. 664 (Ch. 1927); Schaffer v. Krestovnikow, 88 N.J. Eq. 192 (Ch. 1917), affirmed 89 N.J. Eq. 549 (E. & A. 1918); Tyll v. Keller, 94 N.J. Eq. 426 (E. & A. 1922).
Under the circumstances, plaintiff's marriage to decedent is deemed valid and accordingly she is his widow for the purpose of this litigation. In connection with this conclusion, it must be noted also that during decedent's lifetime, plaintiff obtained an order for support against him in the circuit court of Florida and that thereafter she prosecuted an action for separate maintenance against him in New Jersey. Apparently, in both places decedent conceded the validity of their marriage. Frank v. Frank, 10 N.J. Super. 73 (App. Div. 1950); Frank v. Frank, 7 N.J. 225 (1951).
Turning then to the dower problem, it appears that the deceased, Joseph Frank, Sr., acquired title to the premises in question on December 1, 1926, subject to a mortgage held by the Perfection Building and Loan Association of Newark, N.J. Title remained in him until January 16, 1937, when, through foreclosure and a sheriff's deed, the mortgagee became the owner.
Joe's Hill Top Tavern, which subsequently became Frank's, Inc., was incorporated in the latter part of 1934 and to it Frank, Sr., transferred the good will, stock and fixtures of the tavern he had been conducting on the premises referred to. He also transferred a 1932 Dodge automobile. In return therefor, he received seven shares of stock out of 13 shares issued. Five shares were issued to one John Lieb, whose contribution to the corporation is not disclosed by the evidence. One share was issued to a son, Anthony (now Joseph) Frank. This was merely a qualifying share given to him by his father. Some time prior to April 1, 1937, Frank, Sr., *113 acquired Lieb's holdings and so became the actual owner of all the corporate stock.
On April 1, 1937, at a special meeting of the board of directors, the officers were authorized to sign a contract to purchase the property in question for $24,949.81 from the building and loan association. The transaction was completed and a deed obtained and recorded on October 28, 1938. The conveyance was subject to a purchase money mortgage in the amount of $20,000.
The plaintiff was not married to decedent at the time of the acquisition of the property in his own name, nor at the time of the creation of the corporation, nor when the corporation contracted to buy the property. The marriage took place September 14, 1938. There is no suggestion in the evidence that the purchase in the corporate name was made in anticipation of the marriage, even though the deed was not received until about six weeks thereafter.
Apparently the deed to the corporation proved to be defective and a corrective deed was given on July 6, 1942. At this time a new mortgage in the amount of $14,932.26 was executed and the original one of $20,000 was cancelled. The two sons (children of a previous marriage), who are defendants in this action, joined individually with their father on the bond.
Mrs. Frank said that the interest and principal payments on the mortgage were always made by her husband. The corporation had no bank account and he handled the funds derived from the operation of the tavern as his own money. In fact, it is undisputed that the $14,932.26 mortgage was paid off on January 14, 1944, by the decedent personally.
It appeared also that the checks which were paid on account of the outstanding support order, came from the proceeds of the tavern.
Plaintiff and decedent lived in the property in question until 1947, when they went to Florida. Thereafter marital difficulties arose between them and the litigation already referred to followed both in Florida and in New Jersey. In *114 1949, a separate maintenance proceeding was pending in this State but no proof has been offered here to show that restraints were sought on the transfer of the premises involved here by the corporation or that any action was brought to protect or establish a claim of dower therein. In fact, the opinion of the Appellate Division indicates that three matters were presented there, one "for separate maintenance; the second for arrearages of alimony due under an interlocutory order of one of the circuit courts of Florida; and the third for money loaned."
The sons, Michael and Joseph Frank, Jr., were working in the tavern business with their father. The license to operate the tavern had always been held by the father in his own name. It continued so until some time in 1950, when it was transferred to the corporation.
Early in February, 1950, Frank, Sr., was stricken with a heart attack and disabled. According to the sons, he then made an agreement with them to transfer the stock in the corporation to them in consideration of their agreement to run the business and take care of him for the remainder of his life. Pursuant to this agreement, on February 11, 1950, at a corporate meeting, he transferred six shares of stock to each son and one qualifying share to a son-in-law, and resigned his offices in the company.
At this time, plaintiff and decedent were having marital difficulties. The support order had been entered in Florida in November, 1947, and the litigation between them was pending in New Jersey. Although the corporate meeting at which the stock is supposed to have been transferred to the sons was held on February 11, 1950, it is stipulated that the corporate records show that the certificates were not actually transferred until August 28, 1950. The sons were aware of the controversy between their father and stepmother, and they both had testified in the New Jersey action. Also, in explaining the delay from February to August, 1950, in the actual accomplishment of the stock transfer, one of them said *115 that the father suggested awaiting the outcome of the litigation.
The complaint charges that the decedent "caused the corporation to be formed for the express purpose of vesting the naked legal title to said land in it and as part of his fraudulent scheme and design to deprive the plaintiff of her right of dower." And it charges further that the defendants "participated with their father in furthering said fraudulent scheme, well knowing that the said real estate was in fact the property of their father * * *, and that the plaintiff claimed and was entitled to have her dower therein."
There is no support in the evidence for the charge of creation of the corporation to defraud plaintiff of her dower. Nor does the evidence support the conclusion that the sons furthered any such fraudulent scheme.
If the action were predicated upon such a claim of fraud alone, there would have to be a judgment against the plaintiff.
However, the complaint refers to the dower statute (R.S. 3:37-1) under which a widow is entitled to dower of one-half part of all real estate "whereof her husband, or another to his use, was seized of an estate of inheritance at any time during coverture." And plaintiff contends that proof of seizure of the property during coverture, by the wholly-owned corporation of the decedent, requires a judgment declaring plaintiff's dower.
The scope of this statute is a very difficult problem to determine. Plaintiff argues that any time a husband purchases realty in the name of a wholly-owned corporation, which he uses simply for purposes of business convenience, he subjects that realty to his wife's dower. Supposing a husband's business is buying and selling real estate, and to facilitate the conduct of that business, he forms a corporation and acts through it, can dower be established by the wife in each acquisition, even though the husband operates in good faith? Would this statute cast upon a bona fide purchaser dealing with such a husband through his corporation in the ordinary course of business, an obligation to insist upon the *116 wife's signature on the deed to release her dower, if he was aware of the existing marriage and of the fact of complete ownership of the corporation by the husband? It seems unlikely that the Legislature intended to so restrict a husband's operations in real estate. However, it is not necessary to determine those questions here.
The factual situation in this case seems to bring it within Telis v. Telis, 132 N.J. Eq. 25 (E. & A. 1942). There, the wife filed a bill for separate maintenance and to have declared her inchoate right of dower in lands allegedly purchased by the husband but title to which was vested in a corporation wholly owned and controlled by him for the purpose of defrauding her of her dower right. The advisory master, finding no fraud as alleged, dismissed the dower claim. The Court of Errors and Appeals agreed that fraud as alleged had not been substantiated, but it reversed by a divided court. The reversal was based upon a finding that the creation of the corporation was "in the equitable sense fraudulent." It said:
"The corporation was never perfected; respondent held all of the stock notwithstanding that the two shares were in the names of others; there never was a formal meeting; no by-laws were ever adopted and corporate funds were intermingled with respondent's funds and used in payment of respondent's personal obligations. Form and not substance was effected. These and all other circumstances in the case entirely convince us that the corporate creation was, and its existence is, a mere sham, a mere subterfuge, a mere instrumentality employed for concealing the truth and, therefore, in the equitable sense, fraudulent."
While there are some superficial differences in the two cases, they do not appear to be of sufficient substance to justify a failure on the part of this court to follow the pronouncement of the Telis case.
Furthermore, the additional facts, already referred to, namely, the knowledge of the defendants of their father's ownership of the corporation and of his marital difficulties with their stepmother, appear to deepen what the Court of *117 Errors and Appeals said was "in the equitable sense, fraudulent."
In one sense the wife in the Telis action presented a more sympathetic plea. She brought her action in the lifetime of her husband and he was given the opportunity to give personal testimony as to the reason for the creation of the corporation and the transfer of the property to it. Here, although the plaintiff sued her husband on the three counts set forth above, she did not present her dower claim until after his death. As a result, the defendants lost the benefit of his testimony. However, neither laches nor estoppel has been pleaded or argued, and so the effect of the delay upon the application of the Telis case has not been considered.
There will be a judgment entered declaring that the premises in question are held by the corporation, subject to the consummate dower of the plaintiff.